```
 1              IN THE UNITED STATES DISTRICT COURT
           FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
 2

 3   UNITED STATES OF AMERICA,       Criminal Action
                                     No. 1:08CR369-2
 4          Plaintiff,

 5   vs.                             Greensboro, North Carolina
                                     February 24, 2010
 6   TOMMY LEWIS BENNETT, JR.,

 7          Defendant.

 8   _____/

 9

10              TRANSCRIPT OF SENTENCING PROCEEDINGS

11          BEFORE THE HONORABLE N. CARLTON TILLEY, JR.

12                 UNITED STATES DISTRICT JUDGE

13   APPEARANCES:

14   For the Government:      PAUL WEINMAN, ESQUIRE
                              Assistant United States Attorney
15                            Post Office Box 1858
                              Greensboro, North Carolina 27402
16

17   For the Defendant:      DAVID B. FREEDMAN, ESQUIRE
                              301 North Main Street
18                            Suite 700
                              Winston-Salem, North Carolina 27107
19

20   Court Reporter:         J. Calhoun, RPR
                              Room 101, U.S. Courthouse Building
21                            324 West Market Street
                              Greensboro, North Carolina 27401
22                            (336) 332-6033

23

24          Proceedings reported by stenotype reporter.
        Transcript produced by computer-aided transcription.
25
```

1                          <u>**INDEX**</u>

2
                    <u>DIRECT</u>    <u>CROSS</u>    <u>REDIRECT</u>    <u>RECROSS</u>
3
<u>WITNESSES FOR THE</u>
4 <u>DEFENSE:</u>

5 Tommy Bennett

6 Officer Lagrand

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           (Defendant is present.)

2           MR. WEINMAN:  Your Honor, the next matter is

3  1:08CR369-2.  David Freedman is here representing Tommy

4  Lewis Bennett, Jr.  The matter is on for imposition of

5  sentence.

6           THE COURT:  Mr. Bennett, have you read your

7  presentence report?

8           THE DEFENDANT:  Yes, sir.

9           THE COURT:  And talked with Mr. Freedman about it?

10          THE DEFENDANT:  Yes, sir.

11          THE COURT:  Mr. Freedman, tell me about

12 objections.

13          MR. FREEDMAN:  There were no objections to the

14 presentence report.

15          THE COURT:  And do you agree with that,

16 Mr. Bennett?

17          THE DEFENDANT:  Yes, sir.

18          THE COURT:  Mr. Weinman, you do not have any

19 objections?

20          MR. WEINMAN:  We do not have any.

21          THE COURT:  In that event, I will adopt the

22 presentence report, both with regard to the factual content

23 and the guideline applications.  The total offense level is

24 a 27.  The criminal history category is a three.  The

25 guideline range is 120 months.  The supervised release

1  range, five years.  Fine range, 12,500 to 4 million.  There

2  is a $100 special assessment.

3          Will there be evidence, Mr. Weinman?

4          MR. WEINMAN:  Not from the Government, Your Honor.

5          THE COURT:  Mr. Freedman.

6          MR. FREEDMAN:  Not as to the guidelines.  I would

7  like to allow Mr. Bennett to be heard as to his level of

8  cooperation, for the Court to take that into consideration.

9          THE COURT:  He can come around.

10          **(TOMMY LEWIS BENNETT, THE DEFENDANT HEREIN, WAS**

11  **SWORN.)**

12                      **DIRECT EXAMINATION**

13  BY MR. FREEDMAN

14  Q.   Would you state your name for the Court.

15  A.   Tommy Lewis Bennett, Jr.

16  Q.   Mr. Bennett, you pled guilty to conspiracy charges in

17  this case; is that correct?

18  A.   Yes, sir.

19  Q.   Did you at some point begin your attempt at

20  cooperation, to cooperate with the Government and various

21  state agencies?

22  A.   Yes, sir.

23  Q.   Do you remember when that started?

24  A.   It started around January 16, 18th.

25  Q.   It's been over a year; is that correct, '09?

1    A.    Yes, sir.

2    Q.    You started your debriefings prior to pleading guilty

3    in this case?

4    A.    Yes, sir.

5    Q.    Who was the first agent or what was the first agency

6    that you provided information to?

7    A.    First agency I provided information to was Montalvo,

8    ATF, and Greensboro Police Department Narcotics, Officer

9    Marsh.

10   Q.    That was at the Winston-Salem Jail; is that correct?

11   A.    Yes, sir.

12   Q.    And how many people did you provide information on at

13   that time?  Do you remember, approximately?

14   A.    Twenty close friends of mine at that time.

15   Q.    And the people that you provided information on, were

16   they all living in one area of the state?

17   A.    They all resided in Greensboro, Guilford County.  I

18   mean, here in Greensboro.

19   Q.    Do you know if you provided any information at that

20   time on people either in Richmond County or Scotland County?

21   A.    Not at that current time, but on my visits.

22   Q.    Are you aware of any arrests involving people that you

23   provided information on the first go-around?

24   A.    Yes.  On my first visit with Agent Montalvo, Dejaun

25   Mitchell was a close friend of mine at the time.  He was the

1  first person that was arrested in Greensboro.

2  Q.   Do you know what he was arrested for?

3  A.   Yeah.  They seized money, marijuana and Ectasy pills,

4  and some marijuana out of the toilet.  Right after the

5  arrest was made, Agent Montalvo sent Officer Marsh to

6  debrief me, and he wanted to know about a person that I used

7  to work for, Alex Little.  I gave information on him.  The

8  information I gave on him was based off of our work history

9  and we used to work together in landscaping, and --

10 Q.   And he was arrested on a firearms charge?

11 A.   Yes, sir.

12 Q.   Did you talk to Marsh about other individuals at that

13 time?

14 A.   Yes.  At that time I spoke about guys that I used to

15 hang out with at the club.

16 Q.   That's in Greensboro?

17 A.   In Greensboro.

18 Q.   Did you provide information about people outside of

19 Guilford County at that time?

20 A.   Yes, sir.  At that time, that's when I started to

21 provide information on friends, childhood friends from back

22 home, Rockingham and Scotland County -- Richmond County and

23 Scotland County, I'm sorry.

24 Q.   When was your next debriefing after that?

25 A.   All of this took place before my birthday.  It was the

1  month of February.

2  Q.   That took place still while you were in Forsyth County

3  Jail?

4  A.   Correct.  Your Honor, this next debriefing came March

5  the 18th, first day that I was at Alamance County, March the

6  18th, and I spoke with Detective Banks.  He's Goodykoontz's

7  partner.

8  Q.   Do you know who Detective Banks is --

9  A.   Greensboro Police Department.

10 Q.   Do you remember who you provided him information on at

11 that time?

12 A.   At the time it was Dallas and Dean.  I'm not sure of

13 their last them.  But he had a photo of them and he needed

14 to know the identity of the guys.  Your Honor, I gave them

15 the identity, and he said if this check out, I'll be back to

16 see you the next week.  So when he came back the next week,

17 he brung Officer Lagrand of Richmond County.

18 Q.   Officer Lagrand is present in court?

19 A.   Correct.  So I spoke with -- on next visit, I spoke

20 with Officer Lagrand and he was inquiring about -- the main

21 person he was inquiring about was my cousin Paul Bright.  He

22 had photos as well, and I put identity to the photos as

23 well.  He was asking could I assist in a buy or get him to

24 bring something and at that current time I tried to put

25 everything into a perspective, but at the same time, I gave

1   him other drug dealers that was based around my cousin

2   Paul's drug business at the time.

3   Q.    In Rockingham County?

4   A.    In Rockingham and Scotland County.

5   Q.    I'm sorry, Richmond County?

6   A.    Richmond County and Scotland County.

7   Q.    Do you remember the other names you gave?

8   A.    Besides Paul, I gave Anthony Promise, Tosha McClain,

9   Kwansy Russell, Deddrick McKenzie.

10  Q.    And you were in custody this whole time, correct?

11  A.    Correct.

12  Q.    So you were not in a position to set up buys or sells?

13  A.    I tried.  I tried.  I tried on two or three occasions.

14  Once with Lagrand in Alamance County through the phone, but

15  they wasn't my friends at the time, wasn't picking up the

16  phone, so I took another route and involved my wife in the

17  scheme or plan to try to lure them in as well.

18  Q.    Who is it that you were trying to set up the buy for?

19  A.    Kwansy Russell.

20  Q.    That was unsuccessful?

21  A.    It was stalled.  It was a stall tactic, because they

22  wanted my wife to drive to Laurinburg, to Rockingham to do

23  the initial buy there and it wasn't -- the focus wasn't on

24  Kwansy, it was just to lure Paul back, so they wanted a

25  direct hit right then and she's never did -- she's never --

1  Q.    She was not involved?

2  A.    -- with drugs at all.  But she was willing to try to

3  assist in the matter on several occasions with me.

4  Q.    Was there eventually a search for Paul Bright?

5  A.    Yes.  This occurred on -- it was one of the first two

6  visits when I was with -- I was in Alamance County, he came

7  to see me.  He asked for a place of residence and I told him

8  several different locations that my cousin Paul had stayed,

9  and a search was done at his home, though, where him and his

10  wife and his kids resided, not the place where he just sell

11  drugs at, but it was the wrong house.

12      When he came back, I told him that was the wrong house,

13  because I had just spoken to Paul over the phone and they

14  just told me the police had just left the house, so by time

15  Lagrand got to see me on my next visit, I spoke of it with

16  him and he had me draw a map.  I drew the map of this

17  location called Green Pond, and I showed him the exact

18  trailer.

19      I told him about the car that my cousin had just got

20  painted and he told me what color it was.  I told him it was

21  the car he maneuvered drugs around in.  I told him about,

22  like I said, the trailer and the time frame they usually be

23  out there, and he took that information and went on -- I

24  tried to further his investigation, but at the same time,

25  this is when I explain to Sabatosky -- Detective Sabatosky

1   out of Scotland County.

2   Q.   Out of Scotland County?

3   A.   Yes.  This is when she contacted -- she was in search

4   of trying to get in touch with who she needed to get in

5   touch with involving a couple guys that was in Greensboro,

6   but they resided in -- their place of home was in Scotland

7   County, but they came to Greensboro to do business that was

8   affiliated with me in my conspiracy.

9   Q.   Did you provide information on them?

10   A.   Yes.  I provided information on that as well, and the

11   guy which was Lorenzo McClain, we all had the same state

12   charge before they pleaded out, so they were wanting to know

13   information about them.  She wanted to know information

14   about him and his gang affiliation, so I gave it to her.

15         Then within March or April, that when she contacted --

16   tried to contact you and Lagrand and I'm not sure if

17   Mr. Weinman at the time.  It was federal DA, because at the

18   time I didn't really know who my DA was because I had David

19   Folmar and he wasn't on my case any more.

20   Q.   Do you know whether any arrests were made from what you

21   told Detective Sabatosky?

22   A.   What I told Sabatosky, that's what led to arrest with

23   Kwansy Russell and McClain on guns possession.  She was

24   trying to get in touch with -- how she prompt the

25   information through the Court and through you, and it was

1  denied that and she spoke with you over the phone, she said
2  that, well, she stated everything to you there, that they
3  said that no information dealing from outside county would
4  be acceptable in the Court, and that's --
5  Q.   So you know there were several arrests made of people;
6  Kwansy Russell, Tosha McClain, you know they were arrested,
7  you know you provided information on them and of course
8  you're in jail and so you don't know whether the information
9  you gave --
10  A.   I was in full contact with these people all the way up
11  until they was exposed to my cooperation, the information
12  that I was providing on them.  Once the charges were brung
13  about to them, that's when my contact with my friends was
14  cut off.
15  Q.   Were you aware whether or not your name was getting out
16  there?
17  A.   Yeah.  I was aware my name was getting out, roughly
18  around my last visit with Officer Lagrand.
19  Q.   Do you know about when that was?
20  A.   August, September, maybe.
21  Q.   How were you aware that your name was getting out
22  there?
23  A.   From the previous phone conversation that I had with
24  Deddrick McKenzie and Kwansy Russell, and it went -- I
25  called and I was like, you know, how is everything going out

there, and they was like, you're trying to set us up, your

wife called my phone to purchase drugs and then she called

back saying that she can't make it down at that time, so

they knew I was federal by then. They knew I was fed

because by initial start nobody knew I was in federal

custody.

Q.   Do you know whether your name appeared on any

paperwork?

A.   My name -- I'm not sure if it appeared on a warrant,

but I know when they went in Alex Little house, I know that

my name was stated, because his wife and myself, we are

close affiliated friends, and when I called one day to have

her call my wife, she said, I can't believe that you did

that, you sent the police to my house and my kids --

Q.   The people that you are providing information against,

what level are they in terms of drug dealing?

A.   Major dealers.

Q.   When you say major dealers, what sort of amounts do

those people --

A.   At the time when I left the streets, all of them was

kilos or half a kilo.

Q.   Do you know whether these people also carried firearms

with them?

A.   Yes.  Kwansy Russell and Lorenzo McClain are known gang

members.

Q.   By providing information, have you put you and your

family at risk?

A.   I put my wife at risk.  Right now I'm at -- I'm not

saying at high risk as she is, because I'm in federal

custody and it's pretty much safe for me, but I'm not sure

about my wife.  She has to continue to go to work and

provide for our kids and provide for me as well.

Q.   Do you know about how many meetings you've had with

Officer Lagrand?

A.   Four, five, maybe with Lagrand.

Q.   And how many times did you talk to Detective Sabatosky?

A.   I talked with Sabatosky five, six, times.  It was all

through phone conversations.

Q.   She never came to see you at the jail?

A.   She couldn't come to see me because they was waiting on

consent because she said she needed permission from a

prosecutor or through my attorney to speak with me at that

time.

Q.   But she wanted your wife to set up a deal; is that

correct?

A.   Later on down, she wanted my wife to do a deal, but it

was told to her that my wife could not participate in a

third-party activity, so.....

Q.   You were informed at some point that if your wife

participated in a third-party deal, you may get no credit

1   for that?

2   A.   I was informed of that roughly around November of '09.

3   Q.   What other agencies did you meet with?

4   A.   I spoke with ATF, DEA, SBI, IRS.  I've assisted IRS

5   with information on some more friends that dealing with

6   money laundering, the identity theft.

7   Q.   What agent was that?

8   A.   Agent Moses.

9   Q.   Can you name any other agent you've met with?

10  A.   Just Greensboro narcotics, December the 4th, I spoke

11  with them.

12  Q.   That was Detective James?

13  A.   Detective James and Goodykoontz.  They said it was a

14  federal investigation.  They had contacted my wife and had

15  me contact them and try to do -- well, I set up a buy for my

16  wife to do.  They said it was approved, because they said it

17  was no problem, so they had me contact another friend of

18  mine, which was Wayne Woolridge.  I contacted him on the

19  phone and told him to set up a quarter or half ounce deal,

20  whatever she needs, just have her call.  So when she called,

21  they was not ready to secure the deal.  They didn't have

22  enough officers at the time to protect her safety, so they

23  didn't want to go through with it.  That was on the first

24  occasion.  Second occasion was the same thing, so it was

25  like the third occasion, roughly around December right after

1  Christmas, she called and he said, yes, he was getting his
2  hair done.  He called --
3          THE COURT:  Who is "he"?
4          THE WITNESS:  Wayne Woolridge, Your Honor.  He
5  called her back and then he told her that he don't mess
6  around no more, he don't sell drugs no more is what he was
7  referring to, and he felt like she was trying to set him up
8  at the time.  Detective James said that was enough at that
9  time to build a conspiracy case because he was already under
10 federal investigation based on information that I provided
11 January the 16th, because he was one of my close friends at
12 the time.
13 BY MR. FREEDMAN
14 Q.   Do you know whether he has been -- do you have any
15 information as to whether he's been arrested yet?
16 A.   I don't know.  I just know that he told my wife that a
17 buy was not even necessary, that he just needed a contact
18 over the phone and place of residence where he was residing
19 at.
20 Q.   Do you have an estimate as to how many times you've
21 been debriefed?
22 A.   From everybody, it is roughly around 15 times.
23 Q.   Have you ever said no to a federal or state agent when
24 they have come to talk to you at the jail?
25 A.   No, sir.

1    MR. FREEDMAN:  I have no further questions, Your

2    Honor.

3    THE COURT:  Mr. Weinman.

4    **CROSS-EXAMINATION**

5    BY MR. WEINMAN

6    Q.   Mr. Bennett, according to your understanding, how many

7    people have been arrested or indicted based on information

8    provided to law enforcement by you?

9    A.   Based on my understanding?

10   Q.   Yes.

11   A.   Based on my understanding, I say at least four people.

12   Q.   Who is number one?

13   A.   Dejaun Mitchell.

14   Q.   And what agency did you give that information to?

15   A.   ATF in Greensboro.

16   Q.   And who specifically?

17   A.   Montalvo.

18   Q.   Who is the next one?

19   A.   Alex Little.

20   Q.   And who did you give that information to?

21   A.   Officer Marsh, Greensboro Police Department.

22   Q.   Who is the next one?

23   A.   Kwansy Russell?

24   Q.   Who did you give information about Mr. Russell to?

25   A.   To Officer Marsh and Officer Blanks, if I'm saying his

1    name correct.

2    Q.    And who is the fourth one?

3    A.    Fourth one is Tosha McClain.

4    Q.    Tosha McClain?

5    A.    Yes, sir.

6            THE COURT:  Is that a woman?

7            THE WITNESS:  Yes, sir.

8    BY MR. WEINMAN

9    Q.    What agency was it and who was the agent you gave that

10   information to?

11   A.    I gave that information to Officer Marsh as well, and I

12   also gave it to Sabatosky, Detective Sabatosky and Officer

13   Lagrand in Greensboro Police Department, which was

14   Greensboro Police Department, sir.

15   Q.    Anybody else other than those four?

16   A.    I just know the alias of the guys, the guy that

17   initially led to me being able to speak to Officer Lagrand,

18   the very first photo.

19   Q.    What was his name?

20   A.    His name was Dallas.

21   Q.    Dallas?

22   A.    Yes.

23   Q.    And you gave that information to whom?

24   A.    Officer Banks.

25   Q.    That's Greensboro Police Department?

1  A.    Yes, sir.

2  Q.    Anyone else?

3  A.    No, sir.

4          MR. FREEDMAN:  I have no further questions.

5          THE COURT:  Mr. Freedman.

6          MR. FREEDMAN:  Your Honor, both Mr. Bennett and I

7  felt it important for Mr. Bennett to testify so the Court

8  could understand sort of the breath and scope of his

9  cooperation.  I know certain things are under investigation.

10 I know some of the people he provided information on will

11 probably never be arrested, but I don't know that I ever

12 represented anyone who has spent that much time being

13 debriefed by every agency around the state, and I think it's

14 something the Court -- I would contend it is something the

15 Court can take into consideration, other than just the level

16 of people he's cooperated, he creates both a risk to himself

17 and family by doing so.  Clearly his name is getting out

18 around the state for having done that, and put he and his

19 family at great risk.

20         THE COURT:  Do you have other evidence?

21         MR. FREEDMAN:  Your Honor, I don't have other

22 evidence.  I don't believe there is a contest that he's

23 talked to all of these various agents and provided

24 information.

25         THE COURT:  But what he sees as valuable

information may not be valuable to the officer, and it may
not be valuable to the United States Attorney's Office, and
if I'm supposed to -- if you just want me to know the level
of his willingness to cooperate, that's one thing, but if
you're wanting me to gauge how helpful that cooperation is,
he's not in a position really to know.

MR. FREEDMAN: No, Your Honor. But under 5K1.1, I
know there are various things the Court can take into
consideration when someone has cooperated; that's the
timeliness of their cooperation, the level of their
cooperation, and the risk of harm that he creates for
himself by cooperating. Those are all the factors under
5K1.1, Your Honor, I would contend the Court can take into
consideration in addition to how many arrests.

Clearly we know the Government puts some value on
it or they wouldn't have filed the motion to start with. I
just believe by statute the Court can take other things into
consideration, just beyond how many people were arrested.

THE COURT: I think you need to make a greater
showing of that for me to make that finding, Mr. Freedman.
Now, Mr. Bennett has much to gain by his testimony, and he
may be a truthful person, I don't know, but he certainly is
an interesting witness in his testimony. There is no one
else to corroborate this, so all I have to go on is what
he's saying.

 1          MR. FREEDMAN:  Your Honor, I would -- I believe

 2    Mr. Weinman has talked to the various agencies.

 3          THE COURT:  Well, maybe Mr. Weinman can --

 4          MR. FREEDMAN:  I don't know that Mr. Weinman can

 5    attest to any more arrests then the arrests he has labeled

 6    here, but I don't believe Mr. Weinman has anything to

 7    contradict what Mr. Bennett has said about his level; how

 8    many times he's been debriefed, all the different agencies

 9    that he's talked to and what he's tried to do.

10          THE COURT:  Okay.  Mr. Weinman, do you have

11    evidence?

12          MR. WEINMAN:  No, Your Honor.  In speaking to the

13    agents, and I haven't spoken to everybody that Mr. Bennett

14    mentioned, but I spoke to Agent Montalvo at least twice.  I

15    spoke to John Marsh a couple of times, and I've spoken to

16    Officer Lagrand.  The only concrete statement I've gotten

17    from any of them was from Officer Marsh, who said that a

18    state possession of a firearm felon case was made based on

19    information provided by Mr. Bennett.  This specific

20    information he provided today is the first I heard of it.

21    Obviously I will check it out, but it's the first I heard of

22    it.

23          MR. FREEDMAN:  I have Officer Lagrand here who can

24    testify about how many times he did debrief Mr. Bennett, if

25    that would be helpful for the Court.

| | |
|---|---|
| 1 | THE COURT:  It's your case, Mr. Freedman. |
| 2 | (**OFFICER LAGRAND, DEFENSE WITNESS, WAS SWORN.**) |
| 3 | **DIRECT EXAMINATION** |
| 4 | BY MR. FREEDMAN |
| 5 | Q.   Would you state your name. |
| 6 | A.   Officer Lagrand. |
| 7 | Q.   Officer Lagrand, how are you employed? |
| 8 | A.   Rockingham Police Department. |
| 9 | Q.   And at some point, you had the opportunity to talk to |
| 10 | Tommy Bennett? |
| 11 | A.   Yes. |
| 12 | Q.   How was it that you got information that led you to |
| 13 | talk to Mr. Bennett? |
| 14 | A.   Through Detective Blanks, Greensboro Police Department. |
| 15 | Q.   And specifically how did that come about? |
| 16 | A.   Detective Blanks contacted me and asked me if I knew of |
| 17 | a Paul Bright and Anthony Promise, who resided -- Bright |
| 18 | resided in Rockingham.  Promise, he wasn't sure if he |
| 19 | resided down there or not, and I told him that I would check |
| 20 | into it. |
| 21 | Q.   That was the result of a debrief that he had with |
| 22 | Mr. Bennett; is that correct? |
| 23 | A.   Yes. |
| 24 | Q.   And were you aware of those two names? |
| 25 | A.   I had heard of the Paul Bright, but I wasn't too |

1  familiar with his dealings.

2  Q.    But he was somebody who was under investigation in

3  Richmond County?

4  A.    He was known to us as a drug dealer.  Nobody was

5  actively pursuing him.

6  Q.    But the information that -- were you asked to come up

7  to speak to Mr. Bennett or did you do that on your own?

8  A.    When Detective Blanks mentioned it to me, he informed

9  me that he was coming back to talk to Mr. Bennett and asked

10  me if I could come along to also ask questions.

11  Q.    And so you went up to Alamance County?

12  A.    Yes.

13  Q.    And did you talk to Mr. Bennett?

14  A.    That's correct.

15  Q.    Do you remember what was discussed in the first

16  debriefing?

17  A.    As far as I can recall, we talked about Anthony Promise

18  and Paul Bright.

19  Q.    Did he also talk to you about a Kwansy Russell?

20  A.    That name was brought up at some point, yes.

21  Q.    Did you have pictures that you brought up with you?

22  A.    Yes, at that time, I did.

23  Q.    And the pictures you brought up with you were people

24  who you believed, or at least Richmond, Rockingham Police

25  believed to be involved with drug dealing?

1   A.    Yes.

2   Q.    And he identified Paul Bright in the picture for you?

3   A.    Paul Bright and Anthony Promise.

4   Q.    Do you remember him identifying Kwansy Russell?

5   A.    The pictures that I brought at that time, I don't think

6   Kwansy was in that.  It was at a different time I met with

7   him.

8   Q.    At a later time?

9   A.    Yes.

10  Q.    Do you remember what else was discussed at the first

11  debrief?

12  A.    Other than Paul Bright and Kwansy and Anthony, no.

13  Q.    Do you know how long -- did you take notes from that?

14  A.    I did take notes.

15  Q.    Do you know about how long you were up there?  Did you

16  meet with him by yourself?

17  A.    The first meeting, I did not meet with him by myself.

18  It was Detective Blanks and Lieutenant Freedman with my

19  agency.  I know on two other occasions I met with him by

20  myself.

21  Q.    Do you know how many occasions you met with him at all?

22  A.    At least four.

23  Q.    And the reason why you kept coming back to see him was

24  why?

25  A.    Trying to get more information on Bright and Promise.

1  The information he provided on Kwansy and another subject

2  that I don't remember his name, they were out of our

3  jurisdiction and we were trying to set something up with his

4  wife, and finally told him that third-party information or

5  cooperation wouldn't be too helpful to his case.

6  Q.   But you kept coming up to see him because he had what

7  you believed would be useful information for you?

8  A.   He had information on some of the guys we were trying

9  to find out stuff on.

10  Q.   And he was always very cooperative with you every time

11  you met with him?

12  A.   Yes.

13  Q.   And he tried to provide all the -- strike that.

14       As a result of some information he provided to you, you

15  actually went into Paul Bright's house?

16  A.   Yes.  A consent search was done.  We actually stopped

17  Mr. Bright on a traffic stop and Lieutenant Freedman spoke

18  with him and got consent to go back to his house since

19  that's where he was coming from.  During the consent search,

20  nothing was located.

21  Q.   But did you talk with Mr. Bennett after that; do you

22  remember?

23  A.   I want to say I did talk to him at least once after

24  that.

25  Q.   And I believe we talked this morning, and Kwansy

1  Russell was arrested; is that correct?

2  A.    He was arrested by a different agency, not my agency.

3  Q.    During a shoot-out?

4  A.    That's correct.

5  Q.    Information that Mr. Bennett provided to you, your

6  lieutenant provided to the SBI or other districts?

7  A.    That's correct.

8  Q.    Do you know which counties his information was provided

9  for?  Do you know which county it went to?

10  A.    Once he provided it to the SBI, I'm not sure which

11  county they contact -- if they contacted any county.  I'm

12  not aware.

13  Q.    Do you remember who the information was given to that

14  went to the SBI?

15  A.    Agent Sullivan.

16  Q.    And he's located where?

17  A.    I want to say out of Moore County.

18          THE COURT:  Fayetteville, maybe?

19          THE WITNESS:  Could be Fayetteville.

20  BY MR. FREEDMAN

21  Q.    Mr. Promise, at least at this the point, has not been

22  arrested; is that correct?

23  A.    That's correct.  Not by my agency he has not.

24  Q.    There was also a Tosha McClain who Mr. Bennett had

25  talked about who has been arrested, correct?

1    A.    By a different agency, yes.

2    Q.    By Scotland County?

3    A.    Might have been Cumberland County.  Fayetteville,

4    Cumberland County.

5    Q.    Do you know the level of dealer Tosha McClain was?

6    A.    No.  I never made contact about Tosha McClain.

7    Q.    Do you know what level dealer Kwansy Russell was?

8    A.    No, sir.

9    Q.    Did Mr. Bennett -- the information that Mr. Bennett was

10   providing to you was on people you knew to be drug dealers,

11   you are just saying that you were unable to do anything

12   about that information?

13   A.    The information he provided to me, I only knew of Paul

14   Bright, and he mentioned Anthony Promise.  The other two, I

15   had no idea who they were or what their dealings were about

16   with Mr. Bennett until I met about him and then when I

17   brought the pictures, I think on the third visit, I had

18   mentioned them on the second visit and he said, yes, the guy

19   is also -- and that was Mr. Russell, but I didn't know

20   Mr. Russell prior to meeting Mr. Bennett.

21   Q.    He is the one who brought up Mr. Russell?

22   A.    Correct.

23   Q.    And the one who brought up Tosha McClain?

24   A.    Correct.

25   Q.    Who proved to be drug dealers?

1  A.   That's about another agency.

2  Q.   I understand.  I'm not saying --

3  A.   As far as I know about the other agency, they were

4  arrested on a shoot-out during a drug deal.  And

5  Ms. McClain, I guess it was on a drug deal also, or involved

6  in drugs.

7  Q.   The reason why communication broke down between you

8  and -- or the reason why you stopped going to Mr. Bennett

9  was, Ms. Morrison, who is back here, was going to set up or

10 attempt to set up a few drug deals, but then it became

11 apparent that Mr. Bennett would not receive credit for

12 third-party cooperation?

13 A.   That's correct.  And the guys that he provided or

14 wanted to do the drug deals about were out of my

15 jurisdiction.

16 Q.   But you were brought into this by the Greensboro Police

17 Department?

18 A.   That's correct.

19           MR. FREEDMAN:  May I have just a minute, Your

20 Honor?

21           THE COURT:  Surely.

22           MR. FREEDMAN:  I have no further questions, Your

23 Honor.

24           THE COURT:  Mr. Weinman.

25           MR. WEINMAN:  No questions.  May he be excused,

1  Your Honor?

2         MR. FREEDMAN:  No objection.

3         THE COURT:  He may.  Thank you, sir.

4         MR. FREEDMAN:  Your Honor, that would be the

5  evidence that I would have today to present.

6         THE COURT:  This was continued from last December

7  so you could get evidence.

8         MR. FREEDMAN:  I understand, Your Honor, because I

9  was having trouble getting up about Officer Lagrand, which

10  is why we subpoenaed him today, and then trying to get him

11  here yesterday was a difficult --

12         THE COURT:  You are not doing your investigation

13  through court settings?

14         MR. FREEDMAN:  Well, Your Honor, if officers won't

15  return my phone call, then I don't believe I have a choice

16  but to issue a subpoena because --

17         THE COURT:  You could have subpoenaed each of them

18  for today, could you not, if that was --

19         MR. FREEDMAN:  I would have, Your Honor.  I didn't

20  know -- I never believed this was a question about that

21  Mr. Bennett had been cooperative and had been debriefed 13

22  or 14 times.  I never -- I believe the only question that

23  came was whether -- the only information I didn't have until

24  talking to Officer Lagrand is how Kwansy Russell and Tosha

25  McClain were arrested, and he didn't know until today when

1  he called the SBI agent and called the various agencies, and

2  I didn't know where they were arrested. Mr. Bennett

3  provided me information knowing these people had been

4  arrested. I tried to get Officer Lagrand beforehand on how

5  they were arrested, and I was unable to determine that until

6  today. Officer Lagrand didn't know that until today until

7  Mr. Weinman and I were downstairs making phone calls.

8          I'm not trying to waste the Court's time. I'm not

9  trying to utilize the Court's time for my investigation, but

10  there is some times I don't have access to someone myself,

11  but if an officer won't return my phone calls, Your Honor, I

12  want to make sure Mr. Bennett's rights are protected.

13          THE COURT: All right. Well --

14          MR. FREEDMAN: In terms of Marsh and Montalvo, I

15  don't believe there is any question -- or Agent Moses or

16  Blanks or any of the other people, I don't believe there is

17  any question that he's talked to them on numerous occasions.

18          THE COURT: Okay. And, you know, I'm not doubting

19  that, but I have heard nothing today which would make me

20  think he is deserving of more than the Government has

21  recommended.

22          MR. FREEDMAN: Well, Your Honor, all I can say

23  is -- and I understand what substantial assistance is and

24  appreciate the Government filed the 5K1.1 and I told

25  Mr. Weinman that.

1          THE COURT:  I'll go to the bottom end of the

2    advisory guideline range to start off with, but other than

3    those two things, I've heard nothing that would make me go

4    beyond that.

5          MR. FREEDMAN:  Well, Your Honor, again, you heard

6    my argument.  The only argument would be the level of danger

7    that he has put himself in and just how much of an effort

8    he's given to the process.  I know people who give

9    information and never get a 5K1.1.  I understand that.  I've

10   been through that situation myself.  I've explained to

11   Mr. Bennett the possibility that if some of this information

12   that has been given bears fruit in the future, he is

13   entitled to a Rule 35 motion, assuming the Government sees

14   fit on that.  We just believed it was important for the

15   Court to see just what an effort Mr. Bennett --

16          THE COURT:  Sure.  I'm happy to have heard what he

17   did, and I respect him for doing that, but I don't see how,

18   considering what I have heard today, that would create more

19   than what the Government has recommended.

20          MR. FREEDMAN:  Yes, Your Honor.  Thank you.

21          THE COURT:  Mr. Weinman, maybe you --

22          MR. WEINMAN:  Don't care to be heard further, Your

23   Honor.

24          THE COURT:  Mr. Bennett, is there anything else

25   that you would like to say?

1          THE DEFENDANT:  No, sir.

2          THE COURT:  Do you want additional time to try to

3    find out more?

4          MR. FREEDMAN:  Well, Your Honor, I don't know that

5    I will be able to provide more to the Court in terms of

6    actual arrests that were made.  I believe the only thing I

7    could provide to the Court would be other agents to tell you

8    why they went to see him time and time again.  I would have

9    no problem, Your Honor, asking them to be here, providing

10   exactly what Mr. Bennett has done, to see what --

11         THE COURT:  Well, you know, I mean, how fruitful

12   has that been?  That is the real question in my mind.  I

13   really don't know about danger.  I mean, there is a big open

14   end on that.

15         MR. FREEDMAN:  Obviously, Your Honor, that's very

16   subjective.

17         THE COURT:  I understand it.

18         MR. FREEDMAN:  And I don't have any -- I don't

19   believe I have evidence of any particular threats, other

20   than comments made to him, we know you're fed, we know what

21   you are trying to do, but in terms of being able to provide

22   anything objective to the Court, I don't have anything.

23         THE COURT:  So mainly what I have heard is an

24   effort, and I commend Mr. Bennett for the effort, but I

25   don't see how that would entitle him to more.

1          MR. FREEDMAN:  Your Honor, actually the only other

2     arrest, and I don't know how much weight the Government will

3     give it, I think we're fairly certain there were two arrests

4     that were made.  One was on Alex Little, which was a gun

5     charge, and I believe that is what's referenced in the

6     5K1.1.  There was also an initial arrest on a Dejuan

7     Mitchell in which there was marijuana and Ectasy pills,

8     which would probably be not much more than a state district

9     court case, and I don't know whether the Government would

10    give any credit for that or not.

11          THE COURT:  And I don't, either.

12          MR. FREEDMAN:  But I am fairly certain that those

13    were the two arrests that were made from the information

14    that he gave.

15          THE COURT:  You know, as I sit here now, I can't

16    make that determination, Mr. Freedman.  I can understand he

17    gave information about a person who was arrested.  How much

18    of that was based upon information given by Mr. Bennett, I

19    don't know.  How much was based on information from other

20    sources, I don't know.

21          MR. FREEDMAN:  I believe the information of the

22    person who was arrested with the gun came directly from

23    Mr. Bennett.

24          THE COURT:  Well, see, I can't accept that as

25    evidence, Mr. Freedman.

1          (Mr. Freedman and the Defendant confer off the

2     record.)

3          THE COURT:  I'm going to take a brief recess and

4     let you talk to Mr. Bennett so you're not having to talk in

5     the presence of the Court, and you can see if that makes any

6     difference with Mr. Weinman, if that changes his thoughts at

7     all, but I just don't have enough information.

8          MR. FREEDMAN:  Yes, sir.  Thank you.

9          (Recess taken.)

10         THE COURT:  Where are we?

11         MR. FREEDMAN:  We appreciate the time.  I've

12    talked with Mr. Bennett.  I believe we are ready to go

13    forward today.  If there is other information out there that

14    we either develop that he's done or with everything he's

15    doing, hopefully there will be future information, then

16    we'll address that in a Rule 35.  We appreciate you giving

17    us time to decide, Your Honor.

18         THE COURT:  Mr. Bennett, is there anything further

19    that you would like to say?  I'm not indicating there should

20    be, I just don't want to miss giving you that opportunity,

21    if there is anything.

22         THE DEFENDANT:  No, sir, Your Honor.

23         THE COURT:  Thank you, sir.

24         Mr. Weinman, nothing further?

25         MR. WEINMAN:  That's correct, Your Honor.

1          THE COURT:  We're pinned to 120 months, and

2     15 percent from that would be how much?

3          MR. WEINMAN:  102, if my math is accurate, but

4     it's always been kind of shaky.

5          MR. FREEDMAN:  I think that's correct, Your Honor.

6          THE COURT:  Giving effect to the 5K1.1, it is

7     ordered that a sentence of 102 months, followed by a five

8     year period of supervised release, with a finding that a

9     fine would work an undue hardship, and there willing no

10    fine, with the $100 special assessment being payable while

11    Mr. Bennett is in custody through the financial

12    responsibility unit of that facility, with the special

13    conditions of supervised release being:  That you should

14    participate in any substance abuse testing that your

15    probation officer instructs you to undertake, Mr. Bennett,

16    regardless of what it is, and if the probation officer

17    directs, you should participate in any substance abuse

18    treatment program, regardless of what that is, whether it is

19    in-patient residential treatment or even something that

20    hasn't even been found yet, whatever it is, but whatever it

21    is, even if it is just simple outpatient counseling, if

22    you're instructed to undergo substance abuse treatment, you

23    may not use alcoholic beverages from the time that treatment

24    is scheduled to start, until it is scheduled to end, and you

25    may have to pay for some of it.  I hope not all of it.  You

1    may have to pay for some of it.

2              Now, I am going to make the recommendation that

3    Mr. Bennett be allowed to participate in the Bureau of

4    Prisons most intensive substance abuse treatment program,

5    and you should do that.  Not only might it have some effect

6    on shortening your sentence, I don't know that it will, but

7    it could, but it would be a good thing for you to do so

8    you're not placed back in a similar situation to where you

9    were back when you were arrested.  I know you've had a

10   problem with marijuana in the past.  You heard Mr. Shakur

11   here, I think this morning, you know, don't let that stuff

12   keep you coming back here.

13             It is obvious from listening to you testify that

14   you're a bright person, and you handle yourself very well

15   and, you know, don't let drugs or marijuana effect your

16   ability to maximize other good things that you can do.

17             Obviously if the information that you have

18   provided results in prosecutions or other things, you can

19   come back and I'll be happy to consider a Rule 35 with

20   regard to that.

21             You have ten days to appeal from the time the

22   written judgment is filed.  Talk with Mr. Freedman, let him

23   know what you would like for him to do in advance of that,

24   so he's not left trying to get in touch with you when the

25   written judgment is filed trying to determine what you want

1  him to do.

2          Anything further, Mr. Freedman, that comes to your

3  mind that we should address?

4          MR. FREEDMAN:  No, Your Honor.  Except for a

5  motion to dismiss Count Four, but not as regards to a

6  sentence, Your Honor.

7          THE COURT:  And that is dismissed.  Anything

8  further, Mr. Weinman?

9          MR. WEINMAN:  No, sir.

10          THE COURT:  We'll adjourn until 2:00 o'clock.

11          (Court adjourned.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    C E R T I F I C A T E

 2

 3        I, J. CALHOUN, RPR, United States District Court

 4   Reporter for the Middle District of North Carolina, DO

 5   HEREBY CERTIFY

 6

 7        That the foregoing is a true and correct transcript

 8   of the proceedings had in the within-entitled action; that

 9   I reported the same to typewriting through the use of

10   Computer-Aided Transcription.

11        THIS TRANSCRIPT CERTIFICATION IS VOID, IF THE

12   SIGNATURE IS NOT ORIGINALLY SIGNED BY THE COURT

13   REPORTER WHO REPORTED THIS MATTER.

14

15

16

17

18

19   Date:   9-30-10            J. Calhoun, RPR
                                United States Court Reporter
20                              324 W. Market Street
                                Greensboro, NC  27401
21

22

23

24

25
```